Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 50008 | **DATE** | 8/18/2010 |
| **CASE TITLE** | Travelers Cas. & Sur. Co. of Am. v. Young Constr. & Paving, LLC, et al. | | |

**DOCKET ENTRY TEXT:**

Travelers' motions for summary judgment on its breach of contract claim [215], against the Youngs on their counterclaim [210], and against Wells and Vander Bleek on their counterclaim [205] are granted. Wells and Vander Bleeks' partial motion for summary judgment against Travelers [202] is granted in part and denied in part. TGT and Curran's motions for summary judgment against the Youngs [220] and Wells and Vander Bleek [218] are denied as moot. Sauk Valley Bank's motion for summary judgment [192] is denied as moot. Wells and Vander Bleek's motion for summary judgment against Young LLC and the Youngs [212] is denied as moot. The third-party complaints brought by the Youngs, Wells and Vander Bleek, and Travelers' cross claim are dismissed without prejudice. Travelers is directed to submit an affidavit to the court stating their total loss and to advise the court if it wants to proceed on its claims for specific performance and injunctive relief within fourteen days.

■ [ For further details see text below.]

Docketing to mail notices.

# STATEMENT

     In May 2007, plaintiff, Travelers Casualty & Surety Company of America ("Travelers"), agreed to lend a payment and performance surety bond to defendant, Young Construction & Paving, LLC ("Young LLC"), to guarantee Young LLC's obligations on a construction project. As a precondition to lending the bond, Travelers required defendants, Young LLC, Jeff Young and Gordon Young, and their wives Monica and Karen (collectively referred to as the Youngs), Luke Vander Bleek and his wife Joan (collectively referred to as Vander Bleek), and Joseph Wells and his wife Terri (collectively referred to as Wells), to agree to indemnify Travelers for any loss incurred on the bond. Young LLC ceased operations and could not complete the project, leaving Travelers to cover the remaining claims. To date, defendants have not indemnified Travelers for its loss or posted collateral.

     Travelers filed a complaint for breach of contract, specific performance of the collateral provisions in the indemnity agreement, and two counts for injunctive relief to seeking collateral against Young LLC, the Youngs, Vander Bleek, and Wells. A default judgment has already been entered against Young LLC. Travelers now seeks summary judgment on its breach of contract claim against all remaining defendants. In response, defendants argue that the indemnity agreement is void because they were fraudulently induced into signing it by insurance agent Dan Curran. Defendants filed counterclaims against Travelers for fraud and also filed third-party complaints against Curran, the insurance agency Trissel Graham & Tool ("TGT"), CPA Roger Colmark, and Sauk Valley Bank. Travelers filed a cross claim against TGT and Curran.

Eight motions for summary judgment are presently before the court. The first four motions are between the original parties to the dispute: Travelers' motion for summary judgment on its breach of contract claim against all remaining defendants; Wells and Vander Bleek's motion for partial summary judgment on the complaint; and Travelers' two motions for summary judgment on the counterclaims brought against it by Wells and Vander Bleek, and the Youngs. The remaining four are motions by or against a third-party defendant: TGT and Curran's motion for summary judgment against Wells and Vander Bleek; TGT and Curran's motion for summary judgment against the Youngs; Sauk Valley Bank's motion for summary judgment against Wells and Vander Bleek; and Wells and Vander Bleek's motion for summary judgment against the Youngs and Young LLC. For the reasons discussed below, all three of Travelers' motions are granted, Wells and Vander Bleek's partial motion for summary judgment is granted in part and denied in part, and the remaining four motions involving the third-party defendants are denied as moot.

## I. BACKGROUND

The following facts are undisputed.[1] Young LLC is an Illinois limited liability company that ceased its operations in December 2007. At all times relevant to this lawsuit, Young LLC was managed by members and sole owners Jeff and Gordon Young, although Jeff was essentially in control. Jeff's son, Aaron, who is not a party to this lawsuit, was made Chairman of the Board at an executive meeting on May 4, 2007, after having recently graduated from college and spent a year as the company's office manager. Also at that meeting, James Vander Bleek, a friend of both Jeff and Gordon, was designated Young LLC's secretary. Although Vander Bleek was not in the construction business, he was a registered pharmacist and owned several pharmacies. As a mentor to Aaron, Vander Bleek often spoke with him about Young LLC and offered his business advice.

Young LLC faced a great deal of financial trouble, particularly with respect to its cash flow. The company's financial statements for the periods ending in 2004 and 2005 reflected losses of over $200,000 and $400,000, respectively. In the first quarter of 2007, Young LLC frequently overdrew its account at Sauk Valley Bank and was notified that the bank would no longer accept overdrafts. By April 2007, Young LLC's cash position became dire: there was not enough money to pay its key vendors or make its payroll obligations, and there was a very real risk that without an infusion of cash from a lender, the company would be forced to shut down.

It is against that back-drop that Young LLC was notified that its bid on Westar, a new construction project in Kansas, was accepted contingent on Young LLC obtaining a sizeable payment and performance surety bond. To obtain the bond, Young LLC turned to Dan Curran, a long-time insurance agent for the insurance agency, TGT. Although Curran had obtained Young LLC's surety bonds from another surety in the past, Westar required a larger bond than that surety could provide. Consequently, Curran contacted Travelers, one of the many sureties to which TGT submitted their clients' business. Travelers had an existing written agreement with TGT titled "Agency Contract," which expressly provided that TGT is an independent contractor for Travelers that may "solicit applications for policies and bind, execute and service policies and endorsements for classes of business and types of risk as [Travelers] may authorize from time to time," but that Travelers "retains all authority to bind, execute, and endorse all new or renewal policies" unless Travelers grants TGT written authorization to do so.

Curran functioned as the contact agent and broker relative to the procurement of the Westar bond. Curran sent some preliminary information regarding Young LLC's financial condition to Travelers' underwriting agent, Lynn Cracraft. Cracraft responded to the information by explaining that the prospect of Travelers providing the surety was a "stretch" and that Travelers would need more information about the company's and owners' finances.

While Curran worked on behalf of Young LLC to obtain a surety bond, Young LLC also knew that they would need an influx of cash to fund the project itself. Together with Aaron, Vander Bleek set out to analyze

## STATEMENT

Young LLC's financial condition and determine how much cash Young LLC would need to fund the Westar project while at the same time funding another ongoing project. The two concluded that the company would need $800,000, in addition to the $200,000 loan that Vander Bleek agreed to lend Jeff and Gordon on April 20, 2007. Young LLC approached Sauk Valley Bank, its primary lender, for a loan, but was turned down. The bank related that it was concerned about Young LLC's losses in previous years, and was at its legal lending limit with respect to Young LLC. Aaron and other Young LLC employees asked Vander Bleek about making another loan. Vander Bleek had a great deal of knowledge about the company, including the problems it was having with cash flow, its prior years of poor performance, and the fact that the bank would no longer loan the company money or permit over drafting. Aaron was eager to provide a full picture of Young LLC's financial condition and gave Vander Bleek full access to Sauk Valley Bank and records that he requested. Jeff also engaged Joseph Wells, a wealthy certified financial planner and business owner, to provide half of the loan. Wells had previously loaned money to Jeff. All parties understood that without a $800,000 loan, Young LLC would not get a bond.

All parties also understood that Travelers was waiting on a reviewed financial statement from Young LLC. Curran asked the long-time CPA for Young LLC, Roger Colmark, to prepare the statement. Colmark had prepared tax returns for Young LLC for the years ending in 2004, 2005, and 2006. Young LLC was under strict time constraints to obtain the surety, so when the preparation was taking longer than Young LLC would have liked, Curran spoke with Vander Bleek about the delay. Vander Bleek offered to contact Colmark himself, but Curran insisted that Colmark knew what he had to provide, and that he had done Curran favors in getting these reports prepared in the past.

On May 2, 2007, Colmark sent Curran an independent accountant's report and two QuickBooks generated reports, a balance sheet and a profit and loss statement. These reports reflected a negative net worth. Curran did not send this first set of documents to any party. Curran determined that this first set did not include a number of items that were necessary, and that it was not a proper financial statement because it included information about other companies that the Youngs owned. He related this to Colmark. On May 4, 2007, Colmark sent a reviewed financial statement to Curran that reflected gross profits of over $700,000 and a net profit of over $400,000 for 2006. Curran sent this statement to Travelers, and Colmark faxed it to the Young LLC offices, where it was received by Aaron and viewed by Vander Bleek.

That same day, Young LLC held a meeting during which it designated an executive committee and announced that Vander Bleek and Wells (and their wives) would lend a total of $800,000 to Young LLC. Curran was notified of their intent to make the loan. Cracraft called a meeting with Young LLC on May 8, 2007. Cracraft, Curran, Wells, Vander Bleek, Jeff Young, and Young LLC's senior project manager attended the meeting at Young LLC's offices. Cracraft explained to Wells and Vander Bleek what would be required of them if they wished to obtain the surety bonds: Wells and Vander Bleek would have to make the $800,000 loan to Young LLC; and Young LLC, Wells, Vander Bleek, and the Youngs personally had to indemnify Travelers. Vander Bleek and Wells reiterated their intent to make the loan and sign the indemnity agreement, but stated that they would only do so if their personal liability was capped at $500,000 each. Vander Bleek spoke at length about the company's finances. However, the reviewed financial statement was not discussed, and neither Curran nor Cracraft was asked to express, or ever did express, any assessment regarding Young LLC's financial condition.

After that meeting, Travelers approved the surety bond subject to certain items, and told Curran of their decision, who in turn sent the pricing and indemnity agreements to Young LLC and Vander Bleek, specifically. On May 14, 2007, Vander Bleek and Wells each made a $400,000 loan to Young LLC that were deposited a few days later into the Westar account. On May 15, 2007, Young LLC, Vander Bleek, Wells, and the Youngs all signed the indemnity agreement.[2] With all the conditions met, Travelers issued a payment and performance bond for $6,696,974.

# STATEMENT

On May 23, 2007, Sauk Valley Bank notified Aaron that the reviewed financial statement created by Colmark was materially misstated; the statement omitted more than $1,000,000 in Young LLC loans. Colmark submits that he left those loans off of the statement because he and Curran knew that Young LLC would not be able to get a surety bond without doing so. Aaron informed Vander Bleek of the problem within 48 hours. Rather than pull their loans, as Vander Bleek had the power to do, Vander Bleek and Wells determined that they would go forward with Westar because they believed that it could still be profitable. On May 30, Vander Bleek wrote Travelers to notify the company that he was terminating any future construction projects with Young LLC, but did not notify Travelers of the misstated financial statement. In December, Young LLC voluntarily terminated its contract with Westar on the project, and Travelers was left to pay the remaining vendor claims. As of December 8, 2009, the total sum of Travelers' loss was $1,440,215.94.

## II. DISCUSSION

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party must identify the specific portions of the record which it believes establishes "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). By supporting its motion with a Local Rule 56.1 statement of facts, the moving party shifts the burden of production to the non-moving party, who must then put forth specific facts that demonstrate a genuine issue for trial. Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006); Fed. R. Civ. P. 56(e)(2). Although the Youngs did not respond to any motions for summary judgment, judgment against them is not automatically granted; rather, "[t]he ultimate burden of persuasion remains with [the moving party] to show that it is entitled to judgment as a matter of law." Raymond, 442 F.3d at 608.

### A. Motions on Complaint

Travelers seeks summary judgment against Wells, Vander Bleek, and the Youngs on its breach of contract claim. Travelers argues that the indemnity agreement between itself and the defendants is unambiguous, that Travelers incurred losses of at least $1,440,215.94, and that defendants are liable for those losses. Wells and Vander Bleek do not dispute the fact that a valid indemnity agreement would require them to pay Travelers for its losses. However, Wells and Vander Bleek contend that the agreement is void. Wells and Vander Bleek argue that Curran withheld material information about Young LLC's true financial condition and directed the preparation of a false financial statement, thereby fraudulently inducing defendants to sign the indemnity agreement. In their motion for partial summary judgment, Wells and Vander Bleek seek judgment on the issue of Travelers' liability, arguing that Curran's alleged misconduct can be imputed to Travelers because Curran was Travelers' agent. Wells and Vander Bleek also argue that should the indemnity agreement be upheld, their liability to Travelers is capped at $500,000 each. The Youngs have not filed any response to Travelers' motion, but also asserted the defense of fraudulent inducement in their answer to Travelers' complaint.

#### 1. Agency

Defendants cannot impute Curran's conduct to Travelers without proving that a principal-agent relationship exists between Curran and Travelers and that Curran was acting within the scope of that relationship when he allegedly misrepresented Young LLC's finances and fraudulently induced the defendants to indemnity Travelers. See Peddinghaus v. Peddinghaus, 314 Ill. App. 3d 900, 904 (2000) (holding that a principal is liable for the deceit of its agent if the conduct was committed "in the very business the agent was appointed to carry out, even where the agent's specific conduct was carried out without knowledge of the principal"). Defendants bear the burden of proving this relationship. Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co., 300 F. Supp. 2d 606, 617 (N.D. Ill. 2003). "The existence and scope of an agency relationship are questions of fact, unless the parties' relationship is so clear as to be undisputed." Anetsberger v. Metro. Life Ins. Co., 14 F.3d 1226, 1234 (7th Cir. 1994) (quotation marks omitted). The undisputed facts before the court establish that Travelers is not

| STATEMENT |
|---|

liable for Curran's alleged misconduct.

Curran was employed by Young LLC as its insurance agent in procuring the surety bond, and acted at all times as Young LLC's agent. However, defendants argue that Curran also had an agency relationship with Travelers in so far as Curran had the apparent authority to make representations concerning Young LLC's financial condition on Travelers' behalf. Under Illinois law, an insurance broker is ordinarily the agent of the insured, not the insurer. Associated Underwriters of Am. Agency, Inc. v. McCarthy, 356 Ill. App. 3d 1010, 1021 (2005). Even where an agency relationship does not exist, an insurance company may be estopped from denying a broker's agency if the insurer, by its words or conduct, held out the broker as having the apparent authority to perform the particular tasks in question. Mizuho Corporate Bank (USA) v. Cory & Assocs., Inc., 341 F.3d 644, 655 (7th Cir. 2003) (applying Illinois law). To establish apparent authority, defendants must show that: (1) Travelers knowingly caused or permitted Curran's exercise of authority; (2) defendants were reasonable in their belief that Curran had that authority; and (3) defendants detrimentally relied on that authority. See Sphere, 300 F. Supp. 2d at 617; State Sec. Ins. Co. v. Burgos, 145 Ill. 2d 423, 431-32 (1991). Only the alleged principal's actions may establish authority, not the words or conduct of the broker. Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc., 326 Ill. App. 3d 126, 137 (2001); see also Archer Daniels Midland Co. v. Hartford Fire Ins. Co., 243 F.3d 369, 374 (7th Cir. 2001) (holding that impressions conveyed by the broker without the insurer's consent "are inadequate under Illinois law").

As an initial matter, the Youngs, having failed to respond to Travelers' motions, have put forth no evidence that they believed Curran was Travelers' agent or that they relied on this relationship when they signed the indemnity agreement. Accordingly, Travelers is entitled to summary judgment on the breach of contract claim against the Youngs. The court now turns to the arguments made by Wells and Vander Bleek. For the remainder of this agency analysis, Wells and Vander Bleek are collectively referred to as "defendants."

Defendants argue that Travelers vested Curran with the apparent authority to make representations about Young LLC's financial condition, and that they relied on these representations when they signed the indemnity agreement.[3] Travelers argues that it did nothing to make defendants believe that Curran had authority from Travelers to speak about the finances of Young LLC. Even if it did, Travelers argues that it was unreasonable for defendants to rely on the financial statement on the basis of that alleged authority when they signed the indemnity agreements.

Brokers commonly act as the communications go-between for the insurance company and the insured, providing documents back and forth between the parties and communicating policy information. Such conduct is not sufficient to establish that the broker is acting as the agent of the insurer, even when the insurer provides him with a commission. Mizuho, 341 F.3d at 656 (holding that insurer did nothing more than "rel[y] exclusively on [the broker] for communication of policy information during the negotiation phase" and therefore apparent authority was not established); Archer Daniels, 243 F.3d at 373 (holding that broker was not acting as agent of insurer where agent received policy from insurer, sent it to insured, and received a commission from the insurer).

Here, defendants have provided no evidence that Travelers permitted Curran to make representations about Young LLC's finances on its behalf, or that defendants believed Curran was doing so and relied on that belief when they signed the indemnity agreement.[4] Defendants knew that Curran was an employee of TGT and was engaged by Young LLC to secure a bond for the Westar project. Throughout the negotiations period, Curran commonly acted as the go-between for most of the policy requirements and communications regarding the Westar bond between Travelers and Young LLC and its representatives, including sending Travelers a financial statement, communicating Travelers' preconditions for the surety contract to defendants, and sending them the contract to sign. While this conduct may have established Curran's authority to receive and transmit communications for Travelers, or to accept receipt of documents on Travelers' behalf, see Burgos, 145 Ill. 2d at 434, it certainly did not establish the only authority that is relevant here: that Curran could represent Young

| STATEMENT |
|---|

LLC's finances on Travelers' behalf.

But defendants argue that Travelers used Curran to do more than communicate information, as evidenced by Curran's role in obtaining the financial statement. The court disagrees. There is no evidence that Travelers permitted Curran to make his own representations about the information contained in the financial statement, or to dictate what would be contained therein. There is also no evidence that Travelers knew any other party would receive the financial statement, let alone later rely on it in signing the indemnity agreement. If anything, Curran's alleged role in manipulating the financial statement is further evidence that his allegiance rested with Young LLC and its efforts to secure a bond for the Westar project. Defendants do not argue that any of Curran's actions involving the procurement of the financial statement were with the purpose of fooling them into signing the indemnity agreement, and for good reason: the purpose of the statement was to convince Travelers to provide a surety, not to convince the defendants that Young LLC was a good investment. Indeed, the precondition of an indemnity agreement was not even presented to defendants until days after the statement was sent to Travelers and weeks after Curran asked Young LLC to prepare it.

Travelers' conduct at the May 8 meeting provides further evidence that it did nothing to make defendants believe that Curran had its authority to represent Young LLC's financial condition. At that meeting, Cracraft told defendants that Travelers would not provide Young LLC with the bond it needed unless defendants signed personal indemnity agreements and provided loans showing that Young LLC would have sufficient capital to finish the Westar project. Travelers did nothing at that meeting to suggest that Curran was its agent. To the extent that Young LLC's finances were discussed, it was Vander Bleek - not Curran or Cracraft - that spoke about the company's finances in an effort to convince Travelers that it could be confident in providing the bond. Vander Bleek even gave a statement with his own financial information to Cracraft at the meeting, not Curran. Based on these undisputed facts, the court finds that Travelers did not hold out Curran as having the apparent authority to make representations about Young LLC's finances.[5]

Furthermore, it was simply unreasonable for defendants to rely on whatever representations they believed Travelers was making through Curran when they signed the indemnity agreements. Reasonableness must be determined "in light of all the surrounding facts and circumstances." <u>Sphere</u>, 300 F. Supp. 2d at 618. Defendants were not disinterested outside investors, and their decision to indemnify Travelers cannot be viewed independently of their role and interest in helping Young LLC obtain a surety bond from Travelers. Vander Bleek was an executive of Young LLC, one with a great deal of knowledge regarding the company's finances. Defendants were approached by Young LLC to provide loans to the company that promised considerable interest (at a rate of 15%) before Travelers entered the picture. Defendants knew that Young LLC hired Curran to obtain a bond, and they spoke with him at length about the bond requirements necessary for the Westar project. Once Travelers was contacted, the indemnity agreement and loans were presented as preconditions to Travelers providing the bond, not an agreement with the defendants to be negotiated. Were defendants uninterested in Young LLC obtaining the surety, they never would have agreed to indemnify Travelers - they would have had nothing to gain from it.

As to the financial statement itself, it is undisputed that defendants knew that the statement was prepared by Young LLC's CPA for the purpose of providing it to Travelers. Defendants were not sent the statement by Curran or Travelers; rather, it was sent by Colmark to Young LLC's offices, where it was received by Aaron. The cover page of that document clearly stated: "All information included in these financial statements is the representation of the owners of Young Construction and Paving, LLC." Accordingly, it was simply unreasonable for defendants to believe that anyone other than Young LLC itself was representing the financial condition of the company.[6]

Finally, it was unreasonable for Wells and Vander Bleek to rely on their alleged belief that Curran had authority to represent Young LLC's finances on Travelers' behalf because they agreed in the indemnity

agreement that "there are no separate agreements or understandings which in any way lessen our obligations as above set forth." See Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co., 855 F.2d 406, 418 (7th Cir. 1988) (finding a similar provision in a purchase agreement persuasive on the issue of whether a party reasonably relied on an alleged agency relationship). If defendants believed that Curran was somehow representing the soundness of Young LLC's finances on Travelers' behalf, they were required to exercise reasonable diligence and prudence to ascertain whether Curran was acting within his authority to do so. See Sphere, 300 F. Supp. 2d at 618.

The court finds no evidence in the record indicating that Travelers did or said anything to reasonably suggest to any defendant that Curran had the apparent authority to represent the financial condition of Young LLC. Moreover, even if it had, there is no evidence that defendants reasonably relied on that representation when they signed the indemnity agreement. Accordingly, Travelers is entitled to summary judgment on their breach of contract claim.

### 2. Liability Cap

Wells and Vander Bleek seek judgment on the scope of their potential liability under the indemnity agreement. Wells and Vander Bleek (and their spouses) signed a rider limiting their liability to $500,000 per couple. Travelers does not dispute the validity of this rider. Rather, Travelers argues that Wells and Vander Bleek's motion should be denied because defendants can not seek to rescind the indemnity agreement and at the same time elect to affirm it. Travelers' reliance on this argument is misguided. A party is prohibited from seeking to rescind a contract and recover their consideration, while at the same time affirming the contract and seeking the value it would have received under the contract without the fraud. Beaton & Assoc. Ltd. v. Joslyn Mfg. & Supply Co., 159 Ill. App. 3d 834, 844 (1987), superceded by statute on other grounds, 815 ILCS 505 § 10(a), as recognized in Royal Imperial Group, Inc. v. Joseph Blumberg & Assocs., Inc., 240 Ill. App. 3d 360 (1992). Here, defendants are properly arguing alternative legal theories, not duplicative remedies. Defendants merely seek a ruling that their liability is limited by the indemnity agreement, should the court find the agreement is enforceable.

Accordingly, there is no dispute that the rider signed by Wells and Vander Bleek is enforceable as written, and that their liability to Travelers is limited to $500,000 per couple. Because Curran's alleged fraudulent inducement cannot be imputed to Travelers, Travelers motion for summary judgment against all defendants is granted and Wells and Vander Bleek's partial motion for summary judgment is denied as to their claim of estoppel based on apparent authority, but granted as to the scope of the indemnity agreement.

Travelers did not seek summary judgment on its claims for specific performance of the indemnity agreement (seeking collateral) and for injunctive relief (also seeking collateral). In light of this court's ruling, and given the pre-judgment nature of these forms of relief, the court finds these claims are now moot.[7]

### B. Motions on Counterclaims

In response to Travelers' suit to recover on the indemnity agreement, defendants filed counterclaims against Travelers. The Wells/Vander Bleek counterclaim is a charge for fraudulent misrepresentation or fraudulent concealment, but it is not clear which. The Young counterclaim does not bring a claim for fraud, but simply puts forward the affirmative defense of fraudulent inducement. In any event, Travelers interprets these counterclaims to be for fraudulent concealment, and seeks summary judgment on each, and defendants do not protest this interpretation. However, because the court has already determined that Travelers is not vicariously liable for Curran's conduct, it need not address the substantive claims. Travelers is entitled to summary judgment on defendants' counterclaims.[8]

### C. Motions Involving Third-Party Defendants

Having granted summary judgment in favor of Travelers and dismissed the defendants' counterclaims against Travelers, the court has disposed of the only claims that are based on complete diversity. See 28 U.S.C.

| STATEMENT |
|---|

§ 1332(a)(1); <u>Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 373 (1978) ("[D]iversity jurisdiction does not exist unless <u>each</u> defendant is a citizen of a different State from <u>each</u> plaintiff."). The third party complaint brought by Wells and Vander Bleek against TGT, Curran, Colmark, Sauk Valley Bank, Young LLC, and Jeff and Gordon Young is based on this court's supplemental jurisdiction, as the parties are not diverse. Similarly, the third-party complaint brought by the Youngs against TGT, Curran, and Colmark is based on this court's supplemental jurisdiction.

The court declines to exercise supplemental jurisdiction over these state-law claims. <u>See</u> 28 U.S.C. § 1367(c)(3); <u>Wright v. Associated Ins. Cos. Inc.</u>, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits."). The third-party complaints brought by Wells, Vander Bleek, and the Youngs, and all claims therein, are dismissed without prejudice. Therefore, the motions for summary judgment arising from those third-party complaints are dismissed as moot.

### III. CONCLUSION

For the reasons stated above, the court finds that Travelers is not vicariously liable for Curran's alleged misconduct. Accordingly, Wells and Vander Bleek's motion for partial summary judgment is denied as to the respondeat superior claim and granted as to the scope of their liability to Travelers. Travelers' motions for summary judgment against all defendants on the breach of contract claim and on defendants' counterclaims are granted. Travelers is directed to submit an affidavit verifying its total loss within fourteen days of this judgment. Finally, if Travelers wishes to proceed on its claims for specific performance and injunctive relief, Travelers must notify the court of its intent to do so within fourteen days, or these claims will be denied as moot.

All remaining claims involving the third-party defendants are dismissed without prejudice. Accordingly, the following motions for summary judgment are also dismissed as moot: TGT and Curran's motion against the Youngs; Sauk Valley Bank's motion against Wells and Vander Bleek; Wells and Vander Bleek's motion against the Youngs and Young LLC; and TGT and Curran's motion against Wells and Vander Bleek.

---

1. The Youngs did not respond to either of Travelers' motions. Accordingly, Travelers' statement of facts in both their motion for summary judgment on the complaint and on the counterclaim are deemed admitted. <u>See</u> <u>Raymond v. Ameritech Corp.</u>, 442 F.3d 600, 608 (7th Cir. 2006) (stating that plaintiff's "failure to respond in kind results in deeming admitted the uncontroverted statements in [defendant's] Local Rule 56.1(a) submission"). Moreover, the court will not consider facts that are not properly supported by specific citations to the record. <u>I.A. Rana Enters., Inc. v. City of Aurora</u>, 630 F. Supp. 2d 912, 916 (N.D. Ill. 2009) (holding that "references must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document" (quotation marks omitted)); Local Rule 56.1(b)(3)(B)-(C). Nor will the court consider arguments made in the statement of facts. <u>I.A. Rana</u>, 630 F. Supp. 2d at 918. To the extent that defendants Wells and Vander Bleek failed to comply with the local rules, the following paragraphs of Travelers' Statement of Uncontested Facts are deemed admitted: 23, 33, 34, 38, 46, 52, 57, 76, and 80.

2. Wells did not do his own research before making his $400,000 loan, but instead at all times relied on Vander Bleek's due diligence, just as Wells' and Vander Bleeks' wives relied on Vander Bleek's diligence in signing the indemnity agreement. Accordingly, for the purposes of this opinion, Vander Bleek's knowledge is generally imputed to these three defendants unless otherwise stated.

3. At other times in their briefs, Wells and Vander Bleek argue that Curran's apparent authority was not to represent the financial condition of Young LLC, but to go to any lengths to get the indemnity agreement signed for Travelers. The court disagrees with this broader interpretation. It is not

enough to find that Curran had apparent authority to negotiate or even bind defendants to an indemnity agreement. Defendants must prove that Curran had the apparent authority to perform the specific act that defendants relied on. See Archer Daniels, 243 F.3d at 373 ("Conducting a brokerage business in the normal way does not demonstrate apparent authority to make underwriting decisions for an insurer-for recall that ADM must establish not simply that RHH had authority to receive money and shuffle (or even sign) papers on its behalf but also that it was Hartford's agent for the purpose of deciding what risks to accept, and at what price.").

4. Wells and Vander Bleek submitted preliminary opinions of an expert who they contend can testify to the fact that Curran was Travelers agent and that Curran had a duty to make defendants aware of the discrepancies between the first and second financial statements. The court finds that these opinions are inadmissible because they are legal conclusions and would determine the outcome of the case with respect to Travelers' liability. Good Shepherd Manor Found. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003); see also Boyle v. RJW Transp., Inc., No. 05 C 1082, 2008 WL 4877108, at *3 (N.D. Ill. June 20, 2008) (excluding expert testimony regarding whether trucking company was corporations' direct agent).

5. Wells and Vander Bleek argue that Curran held himself out to be a CPA by signing documents written to Travelers as "Dan Curran, CPA", and that Travelers permitted him to do so. However, the court is not aware of any documents that the defendants actually received or viewed containing this signature prior to signing the indemnity agreement. Defendants cannot rely on facts that they had no knowledge of at the time they signed the indemnity agreement to establish apparent authority.

6. The court notes that once Young LLC obtained the surety bond from Travelers, Vander Bleek contacted Travelers directly when he needed to speak to the company, and did not contact Curran.

7. The court notes that Travelers has a remaining cross claim against TGT and Curran for indemnity. However, this claim is dismissed without prejudice, since the court has found that Travelers is not liable to defendants.

8. Even if it were to address the merits of the Youngs' fraud claim, proving fraud requires a showing that the Youngs relied on the financial statement when they signed the indemnity agreement. However, it is undisputed that Jeff did not review the financial statement, and there are no facts before the court to suggest that any Young defendant ever saw it, let alone relied on it in signing the agreement.